UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| SAMUEL M. CICALO, | : | No. 3:16-cv-00339-SRU |
| | : | 915 Lafayette Boulevard |
| Plaintiff | : | Bridgeport, Connecticut |
| | : | |
| vs. | : | |
| | : | |
| HUNT LEIBERT JACOBSON, P.C., | : | |
| ET AL | : | June 15, 2016 |
| | : | |
| Defendants | : | |

- - - - - - - - - - - - - - - - x

MOTION HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        LAW OFFICES OF JOANNE FAULKNER
            123 Avon Street
            New Haven, Connecticut  06511-2422
        BY:  JOANNE S. FAULKNER, ESQ.


    FOR THE DEFENDANTS:

        HUNT LEIBERT JACOBSON, P.C.
            50 Weston Street
            Hartford, Connecticut  06120
        BY:  PETER A. VENTRE, ESQ.


        Sharon L. Masse, RMR, CRR
         Official Court Reporter
         915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
           Tel: (860)937-4177

1                    (Whereupon, the following proceedings commenced

2     at 10:04 a.m.)

3                    THE COURT:  Good morning.

4                    MS. FAULKNER:  Good morning, Your Honor.

5                    MR. VENTRE:  Good morning, Your Honor.

6                    THE COURT:  We're here in Cicalo --

7                    MS. FAULKNER:  Cicalo.

8                    THE COURT:  -- Cicalo vs. Hunt Leibert.  Could I

9     have appearances, please.

10                   MS. FAULKNER:  Joanne Faulkner representing

11    Mr. Cicalo.

12                   MR. VENTRE:  Your Honor, Peter Ventre from Hunt

13    Leibert representing the defendants.

14                   THE COURT:  Very good.  We're here on the motion

15    to dismiss, and that may be the problem with respect to

16    most of the arguments made.  We're here on a motion to

17    dismiss, not summary judgment.  So --

18                   MR. VENTRE:  I understand, Your Honor, but I

19    wanted, if I may --

20                   THE COURT:  Sure.

21                   MR. VENTRE:  -- I wanted to, at least in review

22    of the rules as to motion to dismiss where they permit us

23    to provide documents that are either subject to judicial

24    notice or documents which the plaintiff had to rely on in

25    order to make her allegations, so I wanted to give to the

1   Court those documents because they are pertinent, and I

2   think they are very pertinent in the sense that the

3   defendant -- excuse me, that the plaintiff has indicated

4   in paragraph 8 of her own complaint that we had, in fact,

5   confirmed the debt, which is what is required under the

6   validation requirement.  So I wanted to let the Court see

7   what we had done.

8           THE COURT:  Right.  No, you have a pretty good

9   argument on the validation.  I think you have trouble with

10  the immunity slash there's a pending foreclosure because

11  there wasn't a pending foreclosure when the letters were

12  sent.  So I don't know how you get that protection.  And

13  it's not clear that there was any false or misleading

14  statement about the amount of the debt; but based on the

15  complaint I can't say, as a matter of law, that it didn't

16  happen.

17          MR. VENTRE:  I believe, Your Honor, if -- one,

18  the plaintiff has, one, admitted that they did receive

19  confirmation of the debt, and I understand from what's

20  required for -- the first hurdle obviously for us, and I

21  don't want to get far afield from Your Honor's question,

22  is that whether we are, in fact, a debt collector, and I

23  think that's --

24          THE COURT:  Well, it says that you are all over

25  your letters, so that at least gives the plaintiff a

1    little comfort.

2         MR. VENTRE:  But, Your Honor, there's a

3    wonderful case out there that I found in which the Court

4    references the Hobson choice of if you don't put that

5    language in there, you are considered having -- you may be

6    considered at some point for violating it.  So by taking

7    the safer avenue, including that language, that should not

8    result in a party therefore being a debt collector but

9    it's, rather, a safe harbor to -- I think Bernie's

10   Hobson's choice, which I like to --

11        THE COURT:  No, I understand.  The problem is

12   that what your argument is, is that you're enforcing a

13   security interest, and therefore you're acting in equity,

14   not in law.  You're not collecting a debt.  The letters,

15   even if I look at the letters, that isn't apparent.

16   You're saying you owe this much.  And the foreclosure

17   action didn't start until after the letters were sent, so

18   how is it that these letters, as a matter of law as

19   opposed to facts that may be resolved after discovery, how

20   is it as a matter of law that these actions were taken as

21   part of an effort to foreclose on a security interest?

22        MR. VENTRE:  Because, Your Honor, those

23   communications were part of the process of the

24   foreclosure.  They're requirements that are required to be

25   provided.  So if our principal purpose is to foreclose or

1    enforce a security interest, we're required to mail or

2    provide those communications, and I think we have a case,

3    well, not from our court but from the District of Rhode

4    Island from 2015 called *Pimental vs. Wells Fargo Bank*.   If

5    I could just quote from that case, if I may, Your Honor,

6    it says:   Thus, a mailed communication by a person, whose

7    business the principal purpose of which is the foreclosure

8    of a mortgage, cannot give rise to a cause of action under

9    either Section 1692e for false and misleading

10   misrepresentation by a debt collector or under 1692d for

11   harassment by a debt collector, because those were all

12   part of the foreclosure action.

13          For foreclosure, the initial requirements, just

14   like in Connecticut, Your Honor, you're required to

15   provide mediation information, you're required to provide

16   the MSN, default letters --

17          THE COURT:   Isn't it a question of fact whether

18   the primary purpose of your activities was to foreclose or

19   to collect a debt?  How can I tell either from the

20   complaint or from what I can take judicial notice of that

21   the letters were sent primarily in furtherance of a

22   foreclosure action that had not yet been filed?

23          MR. VENTRE:   Because they were -- a great

24   example would be, Your Honor, our complaint in the

25   foreclosure action.

```
 1              THE COURT:  Right.

 2              MR. VENTRE:  The Court will discern in the

 3    foreclosure action there's a document called information

 4    relating to validation notice.

 5              THE COURT:  Right.

 6              MR. VENTRE:  And that is giving the defendant

 7    notice that you either have or you will be receiving a

 8    validation notice, which is part of the process.  That's

 9    what precipitated the whole chain of events in this case,

10    was our client -- or us sending a validation notice, the

11    defendant saying he therefore disputes it, and us then

12    responding to it.  That is part of the foreclosure

13    process.  That's why we asked the Court to take judicial

14    notice of it because it starts --

15              THE COURT:  But you're assuming that anything

16    you do, your firm did, was necessarily part of the

17    foreclosure process.  It would not be impossible for you

18    to have been hired to collect the debt or, if you're

19    unable to collect the debt, bring a foreclosure action.

20    And you're assuming, or maybe you know and maybe that's a

21    factual issue that you can prove at some appropriate time,

22    you were hired only to bring a foreclosure action, and if

23    that's the case, you probably have a good argument, but

24    that's a summary judgment issue, isn't it?

25              How can I say on this complaint, which doesn't
```

1   mention foreclosure, and on the judicially noticed

2   documents, which don't give me your retention letter, that

3   the only purpose you were hired for was to bring a

4   foreclosure action?

5           MR. VENTRE:  Your Honor, because in this case we

6   had sent out a validation letter -- you're right, the

7   retention letter is not included.  That is correct.

8   However, by the sheer fact that we commenced a foreclosure

9   action, that the foreclosure action is as a result -- and

10  you're shaking your head, Your Honor, so I'll stop

11  talking.

12          THE COURT:  Well, you're saying because we filed

13  a foreclosure action, everything we did before that as a

14  matter of law was in furtherance of that action.  My point

15  to you is, for all I know the retention letter says:  Dear

16  Hunt Leibert, Please collect this debt.  If you cannot

17  successfully collect the debt by December 1, then file a

18  foreclosure action.  We're done with this guy.  We're

19  tired of it.  So collect, and if you can't, file a

20  foreclosure action.

21          If that's what the retention letter says or if

22  that's what your instructions were orally, how are you not

23  a debt collector, at least potentially, for the part where

24  you're trying to collect the debt?  It may be that they

25  hired another firm to collect the debt and then said,

1   Whoops, now it's time to file a foreclosure action; let's

2   get Hunt involved.

3           MR. VENTRE:  Your Honor, our primary purpose and

4   our purpose for which we were retained -- and, again, you

5   don't have that letter -- is the foreclosure.  The

6   ultimate issue here is whether we are a debt collector

7   where our principal purpose is to enforce a security

8   interest.  That's what we have done, that's what we

9   have --

10          THE COURT:  Right.

11          MR. VENTRE:  -- committed to do, and that's what

12  everything that we do at our office -- our office is a,

13  for lack of a better term because a lot of people refer to

14  us as, is a foreclosure mill.  It's not -- I don't agree

15  with that, those words, but --

16          THE COURT:  I know your firm.  I know that's

17  what you do.  I know that.  But that's not in the

18  complaint.  That's not in what I can consider.  So what

19  you're saying is, We're going to win at summary judgment.

20          That's great.  You probably will.  That's a good

21  strong position to take into settlement negotiations, but

22  it doesn't help you with a motion to dismiss.  That's the

23  problem.  You're asking me to assume facts that I cannot

24  assume at this point.  I have to view the complaint, the

25  allegations, in the light most favorable to the plaintiff.

1          MR. VENTRE:  If I may, Your Honor.  The other

2     issue which seems to be -- what seemed to be the major

3     issue in this case is whether we have properly verified

4     the debt, and I think --

5          THE COURT:  I agree you have a strong argument

6     on that even on the motion to dismiss, I'll hear from

7     Ms. Faulkner in a moment, but that doesn't get rid of the

8     case.  That gets rid of one potential claim.  There's

9     still the false, misleading kind of claim, i.e., the

10    amounts that were told to us were wrong.  Now, I don't

11    know if they are or not, and in your papers you have a

12    theory why they're not wrong, and you may be right, but

13    that's a factual issue.  How much the plaintiff owed is a

14    factual issue that's not set forth in anything I've seen.

15         MR. VENTRE:  But, Your Honor, if I may, Your

16    Honor.

17         THE COURT:  Yes.

18         MR. VENTRE:  A verification doesn't require us

19    to do anything more than to confirm that that's the

20    amount --

21         THE COURT:  I'm agreeing with you on

22    verification.  I'm disagreeing with you that that gets rid

23    of the case.  There's a potential claim, isn't there,

24    under 1692e, false, deceptive or misleading representation

25    in connection with the collection of a debt?

1          MR. VENTRE:  The premise of those claims, Your

2    Honor, from plaintiff are simply bold assertions, nothing

3    more.  There's no identifiable basis, and at least the

4    case law that I read, issues involving motion to dismiss,

5    simply making, I think the words they used were "bold

6    assertions," isn't sufficient for you to maintain an FDCPA

7    claim --

8          THE COURT:  We have facts.  There's three

9    different amounts stated within a period of about five

10   months, right?  They may all -- and they're nine or ten

11   thousand dollars apart, in a very short period of time.

12   He's paying two twenty-one a month, approximately, on his

13   mortgage, right?

14         MR. VENTRE:  I believe so, Your Honor.

15         THE COURT:  Something like that.  And yet in a

16   month or two, it goes up by nine or ten thousand dollars?

17   It may be that that's sufficient, I think, to give rise to

18   an inference that one or more of those statements about

19   the amount of the debt are false or misleading.  Aren't

20   they?

21         MR. VENTRE:  Well, Your Honor, I believe in this

22   case this involved a condo association in which the

23   plaintiff was not paying his condo dues.  One may

24   presuppose in the loan history that was provided along

25   with the note of mortgage that a payment was required to

1    be made or forwarded to cover a failure to pay your condo

2    dues to protect our interests in the property.  The loan

3    history that was attached to the --

4              THE COURT:  Just point me to the paragraph in

5    the complaint that suggests all that.

6              MR. VENTRE:  Oh, there is -- I'm sorry, Your

7    Honor.  The only comments that are made in the complaint

8    is the numbers are inaccurate, that they're improper.

9    They're just standard assertions of attempting to raise

10   issues where there's nothing to support, and my

11   understanding of the law was simply making a bold

12   assertion in the complaint about how numbers are untrue or

13   incorrect without more isn't sufficient to bring it to the

14   level of an FDCPA violation.

15             THE COURT:  Right, but we have more.  We have

16   the numbers.  It's not just saying the numbers are wrong.

17   It's saying, paragraph 10, disclosed a balance of

18   $96,354.27 as of August 15; paragraph 11, in effect

19   disclosed $115,058.54 as of September 3, 2015.

20             MR. VENTRE:  But even paragraph 11, Your Honor,

21   we're not required to do anything but to verify the debt,

22   and that's what we had done.

23             THE COURT:  I'm with you on verifying.  Why is

24   there not a reasonable inference that the increase of

25   $19,000 in a period of three weeks on a principal debt of

```
1    $96,000 does not give rise to an inference that one or

2    both of those numbers are inaccurate or misleading?

3              MR. VENTRE:  Because Number 10, Your Honor, is

4    the principal balance.  That's not the debt itself, it's

5    the principal balance, and that's shown in the documents

6    that are provided to the plaintiff.

7              THE COURT:  Right.

8              MR. VENTRE:  The plaintiff would have to claim

9    that they were not knowledgeable where that number

10   emanated from, when the documents that are provided show

11   that that's the exact principal balance that is due on

12   this loan as of the date of that letter sent to this

13   plaintiff.  That's my point, Your Honor, that there may be

14   confusion in the sense that the plaintiff is attempting to

15   create an issue where a principal balance is just that, a

16   principal balance.  It's defined in the note, the note is

17   attached, along with the loan history, and it provides

18   what the principal balance is.

19             THE COURT:  Okay, let's do it this way.

20             MR. VENTRE:  Yes, Your Honor.

21             THE COURT:  The September 3rd letter discloses a

22   balance of $115,000 plus.

23             MR. VENTRE:  Yes, Your Honor.

24             THE COURT:  The October 19th letter, six weeks

25   later, discloses a balance of one twenty-four plus.  Nine
```

1    thousand dollars in three weeks -- excuse me, six weeks --

2    on a loan of about a hundred thousand dollars.  So nine to

3    ten percent increase in six weeks.

4              Why is there not an inference that arises that

5    one or both of those numbers is misleading or false?

6              MR. VENTRE:  Because, Your Honor, when you see

7    the documents that are provided with the November 19

8    verification, the documents that are attached as the loan

9    history, the loan history provides that there was a

10   significant payment towards the condo association fees and

11   dues that were not paid, which we are entitled to add on

12   and become part of the contract pursuant to the condo

13   rider that's set forth in the mortgage that's also

14   attached.  So if you look at the loan history, you'll see

15   where this money was resulting adding on to the debt, you

16   can see that our rights to that money and to add it to the

17   debt is set forth in the condo rider that's attached to

18   the mortgage, which are the contractual obligations of the

19   plaintiff.  He didn't pay them.  Our client is entitled to

20   pay them to preserve their interest in the property and

21   secure it.  It's set forth in the condo rider.  Those

22   documents were given to the plaintiff.

23             The supposition is that -- and I know that it's

24   the least sophisticated consumer argument, but I also

25   think it's relevant to the Court that these are documents

1    that were provided for a reason, to provide support for

2    the information and for the numbers that are provided,

3    though they're not required, because as the Court agrees,

4    verification doesn't require that.  I hope I'm not

5    misrepresenting the Court's position.  But by providing

6    those documents, we go a step further in not only

7    verifying but giving the backup for that.  A least

8    sophisticated consumer at least executed the loan

9    documents, at least has available to him a loan history

10   and a letter that's also provided as part of the

11   verification that gives that information, the payoff, and

12   so it's asking us to believe or perceive that the

13   consumer, being provided all this information, is utterly

14   incapable of understanding documents that he was held to

15   sign and followed with a loan history that provides the

16   information.

17          And if I may add, Your Honor, certainly this

18   defendant -- excuse me, this plaintiff would be well aware

19   that he had not paid his condo dues, and that was a danger

20   to our client's security interest because of the nine-

21   month priority in our state for condo dues -- or condo

22   dues.

23          THE COURT:  All right, let me hear from

24   Ms. Faulkner.

25          MR. VENTRE:  Thank you.

1          MS. FAULKNER:  Well, one of the points I would

2    like to make, Your Honor, is although they sent a letter

3    saying we are confirming $115,000 balance and enclosed

4    lots of pieces of paper, nothing in there enabled me, who

5    is not the least sophisticated consumer, or my client to

6    figure out where they got the initial $115,000.  So --

7          THE COURT:  Is that required, though?

8          MS. FAULKNER:  I'm sorry?

9          THE COURT:  Is that required or is the debt

10   collector simply required to verify that the amount of the

11   debt stated is correct?

12         MS. FAULKNER:  No, the debt collector cannot

13   just say, We verify, and all the cases are very clear on

14   this, that the debt collector has to give enough

15   information so that the consumer can decide, Yes, I owe

16   this; no, I don't owe this.

17         The case which I will cite on verification comes

18   up on summary judgment is *Haddad vs. Alexander, Zelmanski,*

19   *Danner & Fiorrito*, which is a Sixth Circuit case, 758 F.3d

20   777, and that kind of canvasses all the verification cases

21   to date, and what it says is you've got to answer the

22   question that the consumer asked.  So what the consumer

23   asked here, and that is not before you, is, How do you get

24   this balance?  And what they sent did not explain that at

25   all, but that's what they were required to do to respond

1    to a verification request.

2          THE COURT:  Well, district courts in this

3    circuit have said that verification does not require the

4    debt collector to do anything more than confirm the amount

5    of the debt and the identity of the creditor and relay

6    that information to the consumer.  That's a quote from

7    *Ritter vs. Cohen Slamowitz* out of the Eastern District.

8          MS. FAULKNER:  Yes, they have to confirm the

9    amount of the debt, but they didn't confirm the amount of

10   the debt.  They went all around the amount of the debt.

11   They said, Here's a whole bunch of papers, nothing

12   confirming that 115,000 was owing as of the date of that

13   letter.  So it's verification, not confirmation.

14         THE COURT:  All right, slow down.  Let me -- you

15   agree I can look at the letters?

16         MS. FAULKNER:  Oh, yes.  They're in the record.

17         THE COURT:  Right.  So which letter are you

18   talking about that doesn't do it?

19         MS. FAULKNER:  Oh, and the other thing about the

20   verification is it's quite clear the way you have to do it

21   is go back to your client and get verification.

22         THE COURT:  Right.  I'm looking at the

23   November -- I'm looking at the November 19th letter which

24   says:  In response to your correspondence of September 10,

25   2015 in which you dispute the validity of the debt or a

1  portion thereof, please be advised that we have contacted

2  our client and have confirmed that the amounts reflected

3  as of our correspondence dated September 3, 2015 represent

4  the actual amounts owed to satisfy the referenced loan on

5  that date.

6            MS. FAULKNER:  But they included all sorts of

7  papers which did not back up that statement.  There was

8  no --

9            THE COURT:  But the point is, if all they have

10  to do is go back to the client and confirm the amount, why

11  is that letter, November 19, not sufficient?

12            MS. FAULKNER:  Because they didn't verify the

13  amount.  They gave my client no information whatsoever as

14  to how that $115,000 came about.  You just can't say --

15  well, first of all, you have to go back to the client, and

16  that letter says they did.

17            THE COURT:  Right.

18            MS. FAULKNER:  But the enclosed letter is from

19  Mr. Picard to Mr. Picard.  It is not from the client.  So

20  we don't even know whether they went back to the client at

21  this point.  That's a matter of fact.  But when they do

22  have a specific question, how did you reach this $115,000,

23  you don't send back a letter saying, The figure is

24  correct, amen, end of story.  That isn't what the FDCPA is

25  meant to do.

```
 1              THE COURT:  Well, how is it -- how is it an
 2    unfair debt collection practice not to answer that
 3    question?  In other words, there's nothing false or
 4    deceptive about saying, We went back to our client and
 5    this amount is correct, or there's nothing false or
 6    deceptive about failing to explain the amount.  By the
 7    way, it is explained in the October 19 letter.
 8              MS. FAULKNER:  Not the 115,000.  I don't think
 9    that 115,000 has been explained anywhere, and I've got
10    some discovery out to try to figure out what that is.
11              THE COURT:  Well, the 124,000 is explained.
12              MS. FAULKNER:  It is.
13              THE COURT:  Right.
14              MS. FAULKNER:  But it doesn't allow you to
15    calculate back to the 115,000.  I can --
16              THE COURT:  Okay, so what cases are you relying
17    on that if somebody disputes the debt and they confirm it,
18    that they're further required to give a calculation of how
19    they arrived at that number?
20              MS. FAULKNER:  That's the Haddad case, Your
21    Honor, that essentially says you've got to answer the
22    question that was asked.  If the somebody said -- if
23    Mr. Cicalo just said, I dispute this debt, there was
24    nothing else they could do, but Mr. Cicalo said, How did
25    you get this ninety -- this $115,000 balance?  I don't
```

1  think I owe that much.

2           THE COURT:  All right.  Give me a cite in *Haddad*

3  because I may be --

4           MS. FAULKNER:  It's 758 F.3d 777.

5           THE COURT:  No, I have the case, but I mean

6  what -- give me a jump cite or words --

7           MS. FAULKNER:  I'm sorry?

8           THE COURT:  Where is the statement in *Haddad*

9  that you have to answer the question?

10          MS. FAULKNER:  Well, I'm at -- I only have the

11 slip opinion with me, Your Honor.  Providing -- page 9 of

12 the slip opinion, unfortunately, said:  Even in *Clark,* the

13 debt collector did far more than verify that the amount is

14 the amount owed.  Instead, the debt collector, when asked

15 for verification, obtained information from the

16 creditor -- and we don't know that that was done here --

17 about the nature and balance and provided the debtor with

18 documentary evidence in the form of an itemized statement.

19          We didn't get any itemized statement that added

20 up to $115,000.

21          The next paragraph, I'm sorry, slip opinion page

22 10:  The verification requirement is satisfied where the

23 debtor could sufficiently dispute the payment obligation.

24          They didn't give him any information.  The

25 baseline for verification is to enable the consumer to

1    sufficiently dispute the payment obligation.  An itemized

2    accounting detailing the transaction is the best means of

3    accomplishing that.  We didn't get that.

4              THE COURT:  Well, there's a difference between

5    best means and requirements, and the courts in this

6    Circuit haven't said you have to use the best means.  It

7    may, in fact, make good sense, as the Court there says,

8    but that doesn't mean that the law requires it.

9              MS. FAULKNER:  Well, it's an appellate decision,

10   Your Honor.  The firm did not respond with any explanation

11   such as a date or a description of the nature of the

12   charge.  Instead it filed a lien against Haddad's

13   condominium.  It says:  The verification provision must be

14   interpreted to provide the consumer with notice of how and

15   when the debt was originally incurred or other sufficient

16   information from which the consumer could sufficiently

17   dispute the payment obligation.

18             This is not an "e" violation, Your Honor.  It's

19   a "g" violation.  It's a failure to respond.  So --

20             THE COURT:  Okay.

21             MS. FAULKNER:  There are cases, I know there are

22   cases that copy that merely confirming language, but none

23   of them involve merely saying you owe us this.  They all

24   involve details from which the consumer could actually

25   figure out whether the debt amount was correct or not.

1          THE COURT:  Okay.  All right.  But you're not

2     really disputing at this point that the amount isn't

3     correct?

4          MS. FAULKNER:  I'm sorry?

5          THE COURT:  You're not disputing -- you're not

6     suggesting that the amount, in fact, is incorrect?

7          MS. FAULKNER:  Oh, I am.  I think it can't

8     possibly be correct because it was ten thousand less the

9     month before, and it was ten thousand more the month

10    after.

11         THE COURT:  Well --

12         MS. FAULKNER:  And I know -- and I'm fairly

13    sure --

14         THE COURT:  So you're not taking into account

15    the condo fees?

16         MS. FAULKNER:  Oh, yes -- well, that's a fact

17    issue, but the fact is that they assessed the condo fees

18    six months earlier.  So the condo fees should have been

19    included in the first letter.

20         THE COURT:  Okay.  Let me just back up for a

21    second.  What actual damages is the plaintiff claiming in

22    this case?

23         MS. FAULKNER:  He claims garden variety

24    emotional distress, not being able to figure out how much

25    he owed and try to pay it because the figures kept

1    changing from month to month, losing his condo because

2    they aren't giving him the right information.

3              THE COURT:  Well, he didn't lose his condo

4    because he didn't have the right information; he lost his

5    condo because he didn't pay --

6              MS. FAULKNER:  He hasn't lost his condo --

7              THE COURT:  Okay.

8              MS. FAULKNER:  -- oh, I'm sorry, but the fear of

9    losing his condo --

10             THE COURT:  Okay.

11             MS. FAULKNER:  -- because he couldn't figure out

12   how much he had to pay and how much he owed.

13             THE COURT:  So he's got a thousand dollars

14   statutory and maybe five hundred or a thousand dollars

15   emotional garden variety distress, and then we've got

16   attorney's fees.

17             MS. FAULKNER:  And then he's got attorney's

18   fees.

19             THE COURT:  Right.  So can I just ask why we're

20   not settling this case?  I'm focusing that on the defense.

21             MR. VENTRE:  I'm sorry?

22             THE COURT:  When you have a fee shifting

23   statute, the worst thing you can do is continue the

24   bleeding.  You've got good arguments that you might win at

25   summary judgment, but if you don't, by that point the

1    attorney's fees are going to be through the roof, so why

2    are we -- why are we still here?

3              MR. VENTRE:  She did make an offer, Your Honor,

4    and we did counteroffer, and our counteroffer was

5    rejected.

6              THE COURT:  Well, I'm not suggesting anybody is

7    acting in bad faith.

8              MR. VENTRE:  No, I'm certainly not saying that,

9    Your Honor.  I don't mean to dispose that.  You asked me

10   if we tried to settle it.  We, in fact, did try to settle

11   it, and the offer that we made was not sufficient, which

12   somewhat ironically is very close to --

13             THE COURT:  Well, okay, but is it going to be

14   easier or harder to settle it a month from now?

15             MR. VENTRE:  I would think the fees would be

16   higher, Your Honor, from counsel, certainly.

17             THE COURT:  Yes, I think so too.  Is it going to

18   be easier or harder to settle it after summary judgment?

19   Much harder.

20             MR. VENTRE:  I certainly agree with Your Honor.

21   I certainly agree.

22             THE COURT:  Right.  So what are we doing here?

23   Ms. Faulkner, what are we doing here?

24             MS. FAULKNER:  The first thing I do whenever I

25   file a lawsuit is make an offer of settlement, which I

1    did.  I made another offer last weekend.  I don't recall

2    getting a counteroffer, but we can discuss that in

3    private.

4                    THE COURT:  Well, can we just go off -- can we

5    go off the record for a second?

6                    MR. VENTRE:  Absolutely.

7                    MS. FAULKNER:  We can discuss this in Chambers

8    if we're going to do it --

9                    THE COURT:  Let's just go off the record and

10   just take a minute.

11                   (A discussion was held off the record.)

12                   (Whereupon, the above matter was adjourned at

13   11:09 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.


                    July 13, 2016


                    /S/ Sharon L. Masse
                 Sharon L. Masse, RMR, CRR
                    Official Court Reporter
                    915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
                    Tel: (860)937-4177